[No. 29149. Department Two. March 20, 1944.]

WILEY DUPEA et al., Appellants, v. THE CITY OF SEATTLE, Respondent.[1]

[1]Reported in 147 P. (2d) 272.

*Vanderveer, Bassett & Geisness,* for appellants.

*A. C. Van Soelen* and *George T. McGillivray,* for respondent.

ROBINSON, J.—This controversy arose out of a traffic collision which occurred in the city of Seattle on a bright, clear May day at about 3:15 p. m. The jury was discharged and the cause dismissed on defendant's motion at the close of plaintiffs' case. As to the actual collision, we have only the evidence of the two plaintiffs. Their testimony is supplemented by a plat drawn to scale, and various photographs which were introduced as defendant's exhibits during the examination of the plaintiffs and without objection on their part.

It appears from the plaintiffs' evidence that they had come into Seattle from the south, and were driving in a northerly direction on Beacon avenue which is improved with an eighteen foot strip of black top. As they approached the crest of the hill, they saw the top of a city bus coming toward them on their side of the improved portion of the street, and almost immediately the cause for its wrongful position was apparent. There was a pile of dirt on the west half of the pavement, and in front of it a warning barricade, sometimes called a "horse," with two wide bars painted in black and white stripes indicating that the westerly side of the road was impassable. It was so because a transverse ditch had been excavated, extending

from the west side of the road to about the middle of the black-top strip.

When the whole situation became apparent to the plaintiffs, or should have become apparent, the bus had just cleared the obstruction, and was, presumably, just turning to its proper side of the road. At least, if the plaintiffs had proceeded on their own rightful side and a head-on collision had occurred, they would have been entitled to say that they assumed that the bus, having passed the obstruction, would obey the law and immediately veer to its own right side of the pavement. Plaintiffs, however, chose to leave their proper path and veer to their left into the rightful path of the bus.

The negligence alleged as to the defendant city, however, is not laid to the operation of its transit system, or to any claimed fault of its bus driver, but to the operations of the city's water department. It is pleaded:

" . . . that said bus was on the easterly or left-hand portion of the highway because the City of Seattle through its water department and its employees in said department had made an excavation in the westerly portion of said Beacon Avenue, closing that portion of the avenue to traffic and that the City and its employees negligently failed to post any warning signs or signals or to do anything whatsoever to warn the drivers of vehicles approaching on Beacon Avenue from the southeast about said excavation and the closing of half of the street, although said rise in the street made it impossible for traffic at and near said excavation to be seen by vehicles coming from the southeast until they were within a very short distance therefrom; that when said bus could first be seen by the plaintiffs they were so close to it that there was not enough time for either the bus driver or the plaintiff Wiley Dupea to stop their respective vehicles nor did the driver of either vehicle have time to avoid collision by any means whatsoever and that as a proximate result of the aforesaid negligence and carelessness of the city and its failure to give suitable warning of the above mentioned unusual and hazardous condition of the street said vehicles came into violent head-on collision. . . ."

It is apparent that, as respects the negligence charged against the defendant, the distance that the barricade

could be seen by drivers coming from the south is the pivotal fact. The city claims that the plaintiffs' own evidence shows that the distance is at least 190 feet. The plaintiffs' counsel says 160. But Mr. Dupea testified that some planking, which was set in the asphalt, was at the very crest of the hill. The scale plat shows that this planking was 160 feet from the barricade. Both plaintiffs, however, admitted that the grade, as it approached the crest, was such that the barricade could be seen by one riding in an automobile before he reached the crest of the hill, and Mr. Dupea marked the point on the plat where it could first be seen. From that point to the barricade is 175 feet. The profile of the road on the carefully drawn scale plat warrants the city's contention that it could have been seen for a distance of 190 feet.

Mr. Dupea's testimony shifted somewhat as the case progressed. He first stated that, when he reached the brow of the hill, the bus was 100 feet from him, or a little better. He then testified, as follows:

"Q. It was better than 100 feet from you when you first saw the bus? A. Yes. Q. And at that time didn't you see the planks and the excavation and the dirt piled up and the horse and red lamps there? A. When I got up on top of the hill naturally you could see that. Q. When you got over the brow of the hill you could see that? A. Yes, sir. Q. And you saw the horse and the excavation and the dirt on the street and the bus and everything you saw all about the same time? A. Naturally I would see them, because I wondered why the bus was on that side of the street. Q. And the bus at that time was passing the excavation? A. Yes, sir. It was just about through."

Later, he testified that he did not see the barricade at all until after the collision, and, as to the position of the bus when he first saw it, he testified as follows:

"Q. Can you tell us in feet how far the bus was past the excavation? I might tell you the bus is 28 feet long. Was the bus just coming to it or was it past it? A. It was through it. The back end of the bus was just leaving it."

Later, when asked to mark the position of the bus when he first saw it, he placed it at a point 65 feet south of the

excavation, and still later, he testified that, when he first saw the bus, "it looked like it was right on me." It will be realized that, as the giving of his evidence progressed, he made the situation seem more and more emergent. In his cross-examination, he testified that he came into collision but thirty to forty feet from the planking at the top of the hill, which would be at least 120 feet after the bus passed the barricade.

As an affirmative defense, the city had pleaded the twenty-five mile per hour ordinance, and alleged that plaintiffs were exceeding the lawful limit, and were, in fact, grossly negligent, in that they were driving at a high and dangerous rate of speed. Mr. Dupea testified that he was driving between twenty and twenty-five miles per hour. On this point, Mrs. Dupea's testimony was very definite. She testified that she was accustomed to watching the speedometer when riding in an automobile:

"Q. How definite an idea have you of the speed as you came up to the crest of the hill? A. One time we were going 23 miles an hour. Q. How far was that from the place where you first saw the bus? A. At one of those little ditches, and I told him to slow down because I was a little nervous, and he took his foot off the gas some."

Yet, in spite of this slow speed, in spite of the fact that the car was still on the upgrade, and in spite of the fact, as Dupea admitted, that the street was dry and the traction good, he, although an experienced driver, left his proper path and swung to the left side of the road because he thought that, if he put on his brakes, he would skid. He was also of the opinion that, if he had applied his brakes, it would have taken him fifty feet to bring his car to a stop, which adjusts the matter nicely to his testimony that the actual collision occurred only thirty or forty feet after he first saw the bus.

However, for our present purposes, these shiftings, doubts, and inconsistencies are not to be considered. It was the duty of the trial court, in ruling upon the defendant's challenge to the evidence, and our duty, in review-

ing its ruling, to interpret it in the light most favorable to the plaintiffs. Inconsistencies in the evidence are matters affecting weight and credibility, and these matters are exclusively within the province of the jury. *Keller v. Seattle*, 200 Wash. 573, 578, 94 P. (2d) 184; *Ballard v. Yellow Cab Co., ante* p. 67, 145 P. (2d) 1019.

■ The trial court was of the opinion that there was no evidence upon which the jury could find that the city was in any way negligent; but, in the case of *Bullock v. King County*, 179 Wash. 167, 170, 36 P. (2d) 609, we accepted as authority and applied the following rule, as stated in McQuillin, Municipal Corporations (2d ed.), § 2993:

"It is the duty of the municipality, when the obstructions are placed in the street, to use such means as are reasonably necessary to warn those using the street of the presence of the obstruction, and it is generally a question for the jury, 'under the particular facts in each case, to determine whether or not the means used for this purpose were reasonably sufficient.' "

It is true that the context shows that the court was then concerned with the nature of the barricades rather than with their position, but it would seem, on principle, that the same rule would obtain when the sufficiency of the warning barricade is questioned on account of its location.

■■ The trial court seems to have thought also that the driver's own evidence established his contributory negligence as a matter of law. In ruling upon the defendant's motion to dismiss, he said of the plaintiff driver: "He just simply kept on going instead of stopping." *Prima facie,* Dupea was guilty of negligence in leaving his rightful path to encroach upon that of the bus, but, as is said in *American Products Co. v. Villwock*, 7 Wn. (2d) 246, 256, 109 P. (2d) 570, 132 A. L. R. 1010, there is no doubt but that the rule in this state is that:

" 'When one is confronted with a sudden peril requiring instinctive action, he is not, in determining his course of action, held to the exercise of the same degree of care as when he has time for reflection.' "

The rule applies in this case, if we—as we must for our present purpose—accept the testimony of Dupea that, when he came over the crest of the hill, he saw a big city bus bearing down upon him about one hundred feet away, and at least so near that he collided with it after traveling but thirty or forty feet. In ruling upon this phase of the matter, the learned trial judge did not have the benefit of our very recent *En Banc* decision in *Davis v. Browne, ante* p. 219, 147 P. (2d) 263. In that case, a car was following another and rapidly gaining upon it. The two cars were traveling on a forty-foot highway, consisting of two strips of pavement, each twenty feet in width, with a yellow line in the middle of each strip. Almost immediately after surmounting the crest of the hill, the plaintiff driver realized that the car ahead of him had stopped dead, astride the yellow line dividing the northerly strip on which the two cars were traveling. When he became sure of this, the standing car was, according to his own testimony, still one hundred feet ahead of him. There was room for him to pass on either side, but he collided. He recovered a judgment. On appeal here, it was vigorously argued that a driver who failed to miss a standing car under such circumstances was obviously guilty of contributory negligence. A majority of this court, sitting *En Banc,* held, however, that he was not, since he was faced with an emergency. That being the holding of the court *En Banc,* it is binding upon us, and we cannot say that one who, on coming to the top of a hill on a narrow eighteen foot road, sees a large city bus one hundred feet ahead of him, not merely standing still but coming directly at him at twenty-five or thirty miles an hour, is not confronted by an emergency. Applying that case to this, it is clear that the driver in the instant case cannot be held contributorily negligent as a matter of law.

The judgment is reversed and a new trial granted.

SIMPSON, C. J., MILLARD, GRADY, and MALLERY, JJ., concur.